*In re* CHOW GOO POOI on *Habeas Corpus.*

*(Circuit Court, D. California.* January 26, 1884.)

1. CHINESE RESTRICTION ACT—DETENTION OF CHINAMEN—HABEAS CORPUS.

Where a Chinese person is detained on board of a ship and refused the right to land, whether by the authority of the master in pursuance of the provisions of the Chinese restriction act, or by the refusal of the collector to grant him permission to land, he is restrained of his liberty under or by color of the authority of the United States, and he is entitled as of common right to sue out a writ of *habeas corpus* that the legality of his detention and restraint may be passed upon by the court.

2. SAME—PRODUCTION OF BODY IN COURT—CUSTODY—DETENTION OF SHIP.

When his body is produced in court in obedience to the writ, the control of his person remains with the court, and he may be committed to the custody of the marshal, or be held to bail to await the decision of the court; and if on investigation the court should be of opinion that he had no right to land, it is its duty to remand him to the custody from which he was taken, if the ship be in port and about to return to the country from which he came; but the court has no right, nor color of right, to detain the ship.

3. SAME—RIGHT TO JURY TRIAL.

A Chinaman thus brought before the court has no right to a trial by jury in the investigation before the "justice, judge, or commissioner" to ascertain and find out whether he is unlawfully within the United States.

4. SAME—REMANDING CHINAMAN TO CUSTODY—DUTY OF COURT.

Where the "justice, judge, or commissioner" finds that the petitioner is a Chinese laborer, prohibited by law from landing or from being or remaining in the United States, and, if the ship were in port, and about to return to China, would remand him to the ship to be carried to the country from whence he came. such a finding amounts to a finding in effect that he is unlawfully in the United States, and the court should order him to be remanded by the marshal to the custody from which he was taken, and when the marshal returns that the ship has sailed, a supplemental order may be passed committing him to the custody of the marshal to be held for a reasonable time to await the direction of the president.

5. SAME—ORDER OF PRESIDENT AS TO REMOVAL.

The order of the president may be either general or special. It may be re-

trospective and prospective, and, inasmuch as the law imposes on him the duty of causing the person to be removed to the country whence he came after he shall have been found to be unlawfully here by a "justice, judge, or commissioner," but gives him no power to revise that judgment, and apparently confers on him no discretion in the matter, he may, by a general order, directed to the marshal, (or perhaps to the collector,) direct that all persons who shall thus have been found to be unlawfully here shall be removed, and he may instruct that officer to procure them tickets and effectuate their removal; and if there be any difficulty from the want of appropriation or means at his command in fulfilling that duty imposed on him by law, it is for congress to remove it.

On *Habeas Corpus.*

*S. G. Hilborn,* U. S. Atty., and *Carroll Cook,* Asst. U. S. Atty., for the United States.

*T. D. Riordan,* for defendant.

Before SAWYER, HOFFMAN, and SABIN, JJ.

HOFFMAN, J. By permission of my associates, I proceed to deliver the opinion of the court on the questions that were argued and submitted on last Saturday. The principal questions which are presented for our determination are probably the most important that can arise under this law. On the solution to be given to them will depend, not merely the mode of procedure to be adopted, but whether the terms of the law are such that its obvious object can be carried into practical effect. But, before proceeding to discuss them, there are some preliminary questions that have been raised which, though their solution is not difficult, yet we have thought it best that they should now be passed upon by this court, and by the unanimous opinion of all the judges be set at rest so far as any further discussion of them in this court or the district court is concerned.

We are unanimously of opinion that when a Chinese person is detained on board of a ship and refused the right to land, whether by the authority of the master in pursuance of the provisions of the Chinese restriction act, or by the refusal of the collector to grant him permission to land, he is restrained of his liberty under or by color of the authority of the United States, and that he is entitled as of common right to sue out a writ of *habeas corpus,* that the legality of his detention and restraint may be passed upon by the court. When his body, in obedience to the writ, is produced in court, we are also of opinion that the control of his person remains with the court, and that he may be committed to the custody of the marshal, or be held to bail to await the decision of the court. If, on the investigation, the court should be of the opinion that he had no right to land, it is its duty to remand him to the custody from which he was taken, if the ship be in port, and about to return to the country from whence he came.

We are also of opinion that the court has no right, nor color of right, to detain the ship. The statute confers on us no such power, and in that respect it differs from the statute which relates to cases of prostitutes, or supposed prostitutes, arriving from foreign ports. Not

only have we no power to inflict this great wrong on the owner of the ship, but the exercise of it would be in the highest degree inexpedient and oppressive. It would be vexatious to detain a ship for one or two or three months, while the numerous investigations with regard to the right of her passengers to land are in progress. It would interrupt our trade and intercourse with China. It would disturb the postal service, and it would do a wrong to the owner of the ship whose master may have, in good faith, brought passengers here, who presented to him certificates which, by the law itself, are *prima facie* evidence of the holder's right to land. To detain, therefore, the ship, rotting at the wharves for months, would be as unjustifiable an injury and injustice to the owners as, in our opinion, it would be unwarranted by law.

I now come to the more important and difficult questions which have been submitted for our decision. It being evident that 200 or 300 cases of persons, claiming that they are unjustly restrained of their liberty, could not be investigated within the interval which usually occurs between the arrival and the departure of the ships that ply between this port and China, it results that in a large majority of cases the court would be unable to remand the passenger to the ship on which he arrived, in case the decision of the court should be against the right to land. The question then arises, and it is not free from difficulty, what is to be done with those passengers who remain in the custody and under the control of the court after the ship has departed? By the twelfth section of the act it is provided—

"That any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came, by direction of the president of the United States, and at the cost of the United States, after being brought before some justice, judge, or commissioner of a court of the United States, and found to be one not lawfully entitled to be or remain in the United States."

It will be observed that this section is very vague and inexplicit. It confers no power, in terms, on the "justice, judge, or commissioner" to cause the person to be brought before him. It provides no process by which that object can be effected, nor does it indicate in any way what shall be done by the "justice, judge, or commissioner" in case he shall determine that the person brought before him is not entitled to be or remain in the United States. But the object of the section is apparent, and however inexplicit and indefinite the language is, we feel called upon to effectuate the unmistakable intention of the act, if we can, by construction, inference, and implication, find a warrant in the language of the act for doing so. We are of opinion that, inasmuch as the president's action is conditioned on the previous finding by a "justice, judge, or commissioner" that the person is not lawfully entitled to be in the United States, the power is impliedly conferred on the "justice, judge, or commissioner" to cause the man to be brought before him in order that that fact may be de-

termined; and, further, that it also confers, by implication, on the "justice, judge, or commissioner" who shall find that the person is not lawfully entitled to be in the United States, the right to hold that person for a reasonable time to await the direction of the president for his removal. For, if, upon ascertaining the fact that the person brought before the "justice, judge, or commissioner" is not entitled to be and remain in the United States, he is thereupon discharged, the execution of the duty devolved upon the president to cause him to be removed becomes impossible.

We therefore hold, though not without some hesitation, that the act does, by implication, confer upon the "justice, judge, or commissioner" the right, after having determined that the person is not entitled to be or remain in the United States, to commit him to the custody of the marshal, or to hold him to bail for a reasonable time, until the president's direction can be had. We are also of opinion that the person thus brought before the magistrate has no right to a trial by jury. He is not brought before him as a criminal. No punishment as such is inflicted upon him. The consequence of his being unlawfully here is that he will be sent back to the country from whence he came. The power conferred and exercised is essentially a police power. It is closely analogous to the power freely exercised in the East with regard to idiots, imbeciles, lunatics, paupers, and other classes whose presence is deemed incompatible with the safety or welfare of our own people. The Chinese laborer is met at the frontier, as it were, and, not having the right to enter the country, is denied admission to it. As well might a passenger quarantined in the harbor, or a person sent to the pest-house, as being infected with small-pox, demand the right to trial by jury to ascertain whether he is afflicted with that disease.

We are, therefore, of the opinion that in the investigation before the "justice, judge, or commissioner," to ascertain and find out whether a person is unlawfully within the United States, he has no right to trial by jury. The power exercised by the magistrate is a power summarily to investigate and determine the right of a person to enter or remain in the country,—a power sometimes conferred on commissioners of immigration, but by this law confided to a "justice, judge, or commissioner;" and the whole purpose and operation of the act would be defeated if that inquiry, converted into a criminal prosecution, were to be determined by a verdict of a jury. I may further observe that the power is not given to a court, but is given to a "justice, judge, or commissioner," neither of whom, as such, has any right to summon a jury or can invoke its assistance.

We are further unanimously of opinion that the finding contemplated in the act, so far as we can ascertain from its obscure and vague provisions, is such a finding as may be had on a proceeding by *habeas corpus;* that where the person, by his own procurement, is brought before the court or a judge, on the allegation that he is

unjustly restrained of his liberty, and the return shows that the pretext or cause of the restraint is that he is a Chinese laborer, not by law allowed to land, and the court, after giving him ample opportunity to be heard, determines the question on the proofs, and finds that he is a Chinese laborer, prohibited by law from landing, or from being and remaining in the United States, and if the ship were here and about to return to China, would remand him to the ship to be carried to the country from whence he came, such a finding amounts in effect to a finding by a justice, judge, or commissioner that the person is unlawfully here, within the meaning of the twelfth section of the act. In this, as in other proceedings in *habeas corpus*, the usual order of the court, when the decision is adverse to the applicant, is that the petitioner be remanded by the marshal to the custody from which he was taken. Upon the return of the marshal apprising the court judicially that the vessel has sailed, and that, therefore, the petitioner cannot be remanded to the custody from which he was taken, we are all of the opinion that the judge may, as in the case of an investigation before a commissioner, make a supplemental order committing him to the custody of the marshal, to be hold for a reasonable time, to await the direction of the president; such action of the court on the *habeas corpus* being considered by us to be equivalent and as amounting to a finding by the "justice, judge, or commissioner" contemplated by the twelfth section of the act.

I may further observe, in answer to the pretension that the petitioner has a right to a trial by a jury when the investigation is had before the commissioner, that, where it is had on *habeas corpus*, and the ship is in port, he is remanded to the vessel at once and carried away; and surely he can gain no right to a trial by jury, or any other privilege, from the fact or the accident that the ship has sailed before the determination of the case.

With respect to the time of his detention, it is not claimed or supposed that we have a right to indefinitely confine him or hold him subject to the order of the court. He should be detained a reasonable time, that the president may have an opportunity to perform the duty imposed on him by the act; that is, to direct his deportation at the expense of the United States. An analogy seems to be afforded by the provisions of the extradition law. By that act, a criminal demanded by a foreign nation, and found to be liable to extradition, is committed to prison, but if not taken away by the agents of the power demanding him at the expiration of two months, he may apply to the court for his discharge, which must be granted unless just excuse be shown for the omission to deport him. This provision would seem to afford some guide as to the period of time during which a Chinese person may be detained awaiting the order of the president.

We are further of opinion that the order of the president may be either general or special. It may be retrospective and prospective, and, inasmuch as the law imposes on him the duty of causing the per-

son to be removed to the country whence he came after he shall have been found to be unlawfully here by a "justice, judge, or commissioner," but gives him no power to revise that judgment, and apparently confers upon him no discretion in the matter, he may, in our opinion, by a general order, directed to the marshal, (or perhaps to the collector,) direct that all persons who shall thus have been found to be unlawfully here shall be removed, and he may instruct that officer to procure their tickets and effectuate their removal.   If there be any difficulty from the want of appropriation or means at his command in fulfilling that duty imposed on him by law, it is for congress to remove it.

We also think it proper to avail ourselves of this occasion, as this opinion may possibly attract some public attention, to say that if the Chinese immigrants come in the future in anything like the number in which they have recently arrived, it will be impossible for the courts to fulfill their ordinary functions if these *habeas corpus* cases are to be investigated and disposed of by them.   There remain on the calendar of the district court, I am informed, 190 cases.   For five or six weeks, even with night sessions, I have been unable to make any great impression on them.   All ordinary business, public and private, of the court is necessarily suspended, or, if resumed, these passengers, many of whom may be entitled to their discharge, are left, either in custody or on bail, awaiting the determination of their cases.   It is, therefore, an urgent necessity that congress, by committing that duty to commissioners, or by some other mode, should relieve the courts of the burden of passing on these cases.   I know of no subject that more imperatively demands the attention and the interposition of our representatives in congress.   And to procure this relief to the courts, it is necessary that the decision of the commissioner, or other authority to whom the right to determine these questions is confided, shall be final; for if an appeal can be taken in every case, the same obstruction to the ordinary business of the court will arise.

We are aware that this decision may be open to criticism, and that in the minds of some it may savor of a latitudinarian construction of the act; but we are left to choose between so construing it and the alternative of depriving it almost entirely of practical efficiency.